**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) ) | Civil Action 1:15-cv-00512-TSC |
| GINA McCARTHY, Administrator, United States Environmental Protection Agency, | ) ) ) | |
| *Defendant*. | ) ) | |

---

**MOTION OF PLAINTIFFS FOR SUMMARY JUDGMENT AND REQUEST FOR A HEARING**

**Motion**—Plaintiffs California Communities Against Toxics, Californians Against Waste Foundation, Coalition For A Safe Environment, Del Amo Action Committee, Desert Citizens Against Pollution, Louisiana Bucket Brigade, Louisiana Environmental Action Network, Neighbors For Clean Air, and Ohio Citizen Action (collectively, "Plaintiffs") hereby move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds set forth in the attached: (1) statement of material facts as to which there is no genuine issue, (2) statement of points and authorities, and (3) declarations and other exhibits.

This is an action to compel Defendant Administrator of the U.S. Environmental Protection Agency ("EPA") to perform rulemakings mandated by the Clean Air Act to protect human health and the environment from major industrial sources of highly toxic air pollution. There is no genuine issue as to any material fact, and Plaintiffs are entitled to summary judgment as a matter of law on the question of liability.

Therefore, Plaintiffs respectfully request that this Court declare that Defendant's failures to take the following actions constitute unlawful failures to perform non-discretionary acts or

duties under the Clean Air Act, 42 U.S.C. § 7604(a)(2).  In particular, Defendant has failed to take:

1.      Actions fulfilling its non-discretionary duties under 42 U.S.C. § 7412(d)(6) to review and either to revise or to issue a final determination not to revise the hazardous air emission standards for the 20 major air toxics source categories listed in Plaintiffs' Complaint at ¶ 1 (Apr. 8, 2015) (DKT#1) [1]; and

2.      Actions fulfilling its non-discretionary duties under 42 U.S.C. § 7412(f)(2) to promulgate either health or environmental risk-based emission standards or a final determination that such standards are not required to provide an ample margin of safety to protect public health and prevent an adverse environmental effect for the 20 major air toxics source categories listed in Plaintiffs' Complaint at ¶ 1.

To ensure EPA expeditiously acts as required to control these sources' hazardous air pollution, Plaintiffs further request that this Court order EPA to take each of the overdue actions enumerated above by the deadlines set forth in the accompanying proposed order.

**Request for Hearing Pursuant to L.R. 7(f)**—Plaintiffs respectfully request that the Court schedule an oral hearing on this motion as soon as possible after the conclusion of briefing.

---

[1] Plaintiffs' Complaint listed one additional major air toxics source category on which Plaintiffs are not seeking summary judgment.  The parties have separately stipulated to voluntary dismissal without prejudice solely of Plaintiffs' claims in Paragraph 47 of the Complaint regarding that one source category: Semiconductor Manufacturing (40 C.F.R. Part 63 Subpart BBBBB), as provided in the Joint Stipulation filed on November 17, 2015.

DATED:          November 17, 2015          Respectfully Submitted,

/s/ Nicholas Morales
Nicholas Morales (D.C. Bar No. 1003942)
Emma C. Cheuse (D.C. Bar No. 488201)
James S. Pew (D.C. Bar No. 448830)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, DC 20036
nmorales@earthjustice.org
echeuse@earthjustice.org
jpew@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) ) | Civil Action 1:15-cv-00512-TSC |
| GINA McCARTHY, Administrator, United States Environmental Protection Agency, | ) ) ) | |
| *Defendant*. | ) ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h)(1), Plaintiffs California Communities Against Toxics, Californians Against Waste Foundation, Coalition For A Safe Environment, Del Amo Action Committee, Desert Citizens Against Pollution, Louisiana Bucket Brigade, Louisiana Environmental Action Network, Neighbors For Clean Air, and Ohio Citizen Action (collectively, "Plaintiffs") submit the following statement of material facts as to which there is no genuine issue:

1.      The U.S. Environmental Protection Agency ("EPA") submitted a report to Congress pursuant to 42 U.S.C. § 7412(f)(1) regarding "the risk to public health remaining, or likely to remain" after the application of § 7412(d) emission standards.  *See* EPA, EPA-453/R-99-001, *Residual Risk Report to Congress* (Mar. 1999), *available at* http://www.epa.gov/airtoxics/rrisk/risk_rep.pdf.  Congress did not act on that report's recommendations.  Compl. ¶ 23 (Apr. 8, 2015) (DKT#1); Answer ¶ 23 (Sept. 21, 2015) (DKT#21).

2.      EPA promulgated Clean Air Act emission standards under 42 U.S.C. § 7412(d) for the following listed categories of major sources of hazardous air pollutants on the dates specified in parentheses:

a.      Solvent Extraction for Vegetable Oil Production, 66 Fed. Reg. 19,006 (Apr. 12, 2001) (40 C.F.R. Part 63 Subpart GGGG);

b.      Boat Manufacturing, 66 Fed. Reg. 44,218 (Aug. 22, 2001) (40 C.F.R. Part 63 Subpart VVVV);

c.      Surface Coating of Metal Coil, 67 Fed. Reg. 39,794 (June 10, 2002) (40 C.F.R. Part 63 Subpart SSSS);

d.      Cellulose Products Manufacturing, 67 Fed. Reg. 40,044 (June 11, 2002) (40 C.F.R. Part 63 Subpart UUUU);

e.      Generic MACT II - Ethylene Production, 67 Fed. Reg. 46,258 (July 12, 2002) (40 C.F.R. Part 63 Subpart YY, XX, UU);

f.      Paper and Other Web Coating, 67 Fed. Reg. 72,330 (Dec. 4, 2002) (40 C.F.R. Part 63 Subpart JJJJ);

g.      Municipal Solid Waste Landfills, 68 Fed. Reg. 2227 (Jan. 16, 2003) (40 C.F.R Part 63 Subpart AAAA);

h.      Hydrochloric Acid Production, 68 Fed. Reg. 19,076 (Apr. 17, 2003) (40 C.F.R. Part 63 Subpart NNNNN);

i.      Reinforced Plastic Composites Production, 68 Fed. Reg. 19,375 (Apr. 21, 2003) (40 C.F.R. Part 63 Subpart WWWW);

j.      Asphalt Processing and Asphalt Roofing Manufacturing, 68 Fed. Reg. 22,976 (Apr. 29, 2003) (40 C.F.R. Part 63 Subpart LLLLL);

k. Integrated Iron & Steel Manufacturing, 68 Fed. Reg. 27,646 (May 20, 2003) (40 C.F.R. Part 63 Subpart FFFFF);

l. Engine Test Cells/Stands, 68 Fed. Reg. 28,774 (May 27, 2003) (40 C.F.R. Part 63 Subpart PPPPP);

m. Site Remediation, 68 Fed. Reg. 58,172 (Oct. 8, 2003) (40 C.F.R. Part 63 Subpart GGGGG);

n. Miscellaneous Organic Chemical Manufacturing, 68 Fed. Reg. 63,852 (Nov. 10, 2003) (40 C.F.R. Part 63 Subpart FFFF);

o. Surface Coating of Metal Cans, 68 Fed. Reg. 64,432 (Nov. 13, 2003) (40 C.F.R. Part 63 Subpart KKKK);

p. Surface Coating of Miscellaneous Metal Parts and Products, 69 Fed. Reg. 130 (Jan. 2, 2004) (40 C.F.R. Part 63 Subpart MMMM);

q. Organic Liquids Distribution (Non-Gasoline), 69 Fed. Reg. 5038 (Feb. 3, 2004) (40 C.F.R. Part 63 Subpart EEEE);

r. Stationary Combustion Turbines, 69 Fed. Reg. 10,512 (Mar. 5, 2004) (40 C.F.R. Part 63 Subpart YYYY);

s. Surface Coating of Plastic Parts and Products, 69 Fed. Reg. 20,968 (Apr. 19, 2004) (40 C.F.R. Part 63 Subpart PPPP);

t. Surface Coating of Automobiles and Light-Duty Trucks, 69 Fed. Reg. 22,602 (Apr. 26, 2004) (40 C.F.R. Part 63 Subpart IIII).

Compl. ¶ 34; Answer ¶ 34.

 3. More than eight years have passed since EPA promulgated each of the emission standards set forth in Paragraph 2, above.  Compl. ¶¶ 36-46, 48-56; Answer ¶¶ 36-46, 48-56.

4.      EPA has not completed the reviews required by 42 U.S.C. § 7412(d)(6) and

§ 7412(f)(2), for each of the emission standards and source categories set forth in Paragraph 2,

above.  Compl. ¶¶ 36-46, 48-56; Answer ¶¶ 36-46, 48-56.

5.      EPA has not promulgated a final rule or determination pursuant to 42 U.S.C.

§ 7412(f)(2) for each of the emission standards and source categories set forth in Paragraph 2,

above.  Compl. ¶¶ 36-46, 48-56; Answer ¶¶ 36-46, 48-56.

6.      EPA has not promulgated a revised final rule or determination pursuant to 42

U.S.C. § 7412(d)(6) for each of the emission standards and source categories set forth in

Paragraph 2, above.  Compl. ¶¶ 36-46, 48-56; Answer ¶¶ 36-46, 48-56.


DATED:          November 17, 2015                    Respectfully Submitted,

/s/ Nicholas Morales
Nicholas Morales (D.C. Bar No. 1003942)
Emma C. Cheuse (D.C. Bar No. 488201)
James S. Pew (D.C. Bar No. 448830)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, DC 20036
nmorales@earthjustice.org
echeuse@earthjustice.org
jpew@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, *et al.*, <br><br>     *Plaintiffs*, <br><br>         v. <br><br> GINA McCARTHY, Administrator, United States Environmental Protection Agency, <br><br>     *Defendant*. | Civil Action 1:15-cv-00512-TSC |

**PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS AND LEGAL FRAMEWORK ......................................................... 2

I.    THE CLEAN AIR ACT OBLIGATES EPA TO PERFORM IMPORTANT
      RULEMAKINGS TO PROTECT PUBLIC HEALTH AND THE
      ENVIRONMENT FROM TOXIC AIR POLLUTION. ...................................................... 2

II.   EPA HAS A LEGAL DUTY TO COMPLETE RULEMAKINGS FOR THE 20
      MAJOR AIR TOXICS SOURCE CATEGORIES AT ISSUE IN THIS CASE. .............. 8

JURISDICTION, NOTICE, VENUE, AND STANDING .......................................................... 11

ARGUMENT ............................................................................................................................. 15

I.    SUMMARY JUDGMENT ON LIABILITY SHOULD BE ENTERED FOR
      PLAINTIFFS. ............................................................................................................... 15

      A.   Legal Standard. .................................................................................................. 15

      B.   It Is Undisputed That EPA Has Failed To Complete Clean Air Act
           Rulemakings As Required By § 7412(d)(6) And § 7412(f)(2) For The 20
           Source Categories. ............................................................................................. 15

II.   TO REMEDY EPA'S CONTINUING STATUTORY VIOLATIONS, THIS
      COURT SHOULD COMPEL EPA TO COMPLETE THE OVERDUE
      RULEMAKINGS BY PROMPT DEADLINES. ............................................................. 17

      A.   Legal Standard. .................................................................................................. 17

      B.   The Court Should Compel EPA To Perform The Overdue Rulemakings
           Within One To Two Years. .................................................................................. 19

           1.   EPA Cannot Meet Its Burden To Prove That The Requested Deadlines
                Are Impossible To Meet. .............................................................................. 20

           2.   The Requested Deadlines Would Serve The Public's Interest In
                Achieving The Health-Protective Purposes Of The Clean Air Act. ............... 24

CONCLUSION ......................................................................................................................... 26

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Alabama Power Company v. Costle,*
    636 F.2d 323 (D.C. Cir. 1979) .......................................................................17

*Alabama v. Bozeman,*
    533 U.S. 146 (2001) ....................................................................................16

*Ali v. Tolbert,*
    636 F.3d 622 (D.C. Cir. 2011) .......................................................................15

*American Lung Association v. Browner,*
    884 F. Supp. 345 (D. Ariz. 1994) .................................................................17

*Celotex Corporation v. Catrett,*
    477 U.S. 317 (1986) ....................................................................................15

*Cement Kiln Recycling Coalition v. EPA,*
    25 F.3d 855 (D.C. Cir. 2001) ..........................................................................4

*Ethyl Corporation v. EPA,*
    306 F.3d 1144 (D.C. Cir. 2002) .....................................................................14

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
    528 U.S. 167 (2000) ..............................................................................12, 13

*Hunt v. Washington State Apple Advertising Commission,*
    432 U.S. 333 (1977) ....................................................................................12

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..............................................................................12, 13

*National Lime Association v. EPA,*
    233 F.3d 625 (D.C. Cir. 2000) ........................................................................4

*Natural Resources Defense Council v. EPA,*
    489 F.3d 1364 (D.C. Cir. 2007) ................................................................12, 23

*Natural Resources Defense Council v. Reilly,*
    983 F.2d 259 (D.C. Cir. 1993) .......................................................................16

\* *Natural Resources Defense Council v. Train,*
    510 F.2d 692 (D.C. Cir. 1974) ........................................................... 17-19, 24

\* Authorities upon which we chiefly rely are marked with an asterisk

*New York v. Gorsuch,*
554 F. Supp. 1060 (S.D.N.Y. 1983) ...................................................... 18

*People for the Ethical Treatment of Animals v. USDA,*
797 F.3d 1087 (D.C. Cir. 2015) ........................................................... 14

*Sierra Club v. Browner,*
130 F. Supp. 2d 78 (D.D.C. 2001) ....................................................... 18

*Sierra Club v. EPA,*
551 F.3d 1019 (D.C. Cir. 2008) ............................................................. 3

*Sierra Club v. EPA,*
699 F.3d 530 (D.C. Cir. 2012) ............................................................ 13

*Sierra Club v. Gorsuch,*
551 F. Supp. 785 (N.D. Cal. 1982) ...................................................... 18

*Sierra Club v. Jackson,*
No. 01-1537, 2011 WL 181097 (D.D.C. Jan. 20, 2011) .................... 18, 19

\* *Sierra Club v. Johnson,*
444 F. Supp. 2d 46 (D.D.C. 2006) ................................... 17-19, 21-25

*Sierra Club v. Ruckelshaus,*
602 F. Supp. 892 (N.D. Cal. 1984) .................................................. 17, 23

*Sierra Club v. Thomas,*
658 F. Supp. 165 (N.D. Cal. 1987) ..................................................... 18

*Sierra Club v. Whitman,*
285 F.3d 63 (D.C. Cir. 2002) .............................................................. 18

*WildEarth Guardians v. Jewell,*
738 F.3d 298 (D.C. Cir. 2013) ............................................................ 13

## Statutes

28 U.S.C. § 1391(e)(1) ............................................................................ 12

42 U.S.C. § 7401 ................................................................................... 14

42 U.S.C. § 7412 ..................................................................................... 3

42 U.S.C. § 7412(a)(1) .......................................................................... 3, 8

42 U.S.C. § 7412(a)(6) ............................................................................. 3

iv

42 U.S.C. § 7412(b)(1) .................................................................................................3

42 U.S.C. § 7412(c)(1).................................................................................................3

42 U.S.C. § 7412(c)(5).............................................................................................4, 20

42 U.S.C. § 7412(d) ..............................................................................................5, 6, 9

42 U.S.C. § 7412(d)(2) ................................................................................................4

42 U.S.C. § 7412(d)(3) ................................................................................................4

* 42 U.S.C. § 7412(d)(6) ........................................ 1, 4-7, 9, 11, 14-16, 19, 21, 22, 25

42 U.S.C. § 7412(e)(1) ................................................................................................6

42 U.S.C. § 7412(e)(1)(A).....................................................................................4, 7, 21

42 U.S.C. § 7412(e)(1)(B).....................................................................................4, 7, 21

42 U.S.C. § 7412(e)(1)(C).....................................................................................4, 7, 21

42 U.S.C. § 7412(e)(1)(D).....................................................................................4, 7, 21

42 U.S.C. § 7412(e)(1)(E).....................................................................................4, 7, 21

42 U.S.C. § 7412(f)(1) ................................................................................................5

* 42 U.S.C. § 7412(f)(2) .................................................. 1, 4, 6, 7, 9, 11, 14-16, 19, 21, 22

42 U.S.C. § 7412(f)(2)(A)....................................................................................5, 6, 25

42 U.S.C. § 7412(f)(2)(C)......................................................................................5, 6

42 U.S.C. § 7429(a)(1)(B) ..........................................................................................20

42 U.S.C. § 7429(a)(1)(C) ..........................................................................................20

* 42 U.S.C. § 7604(a) ..........................................................................................11, 15, 17

* 42 U.S.C. § 7604(a)(2)...............................................................................................11

42 U.S.C. § 7607(c)(5)................................................................................................7

42 U.S.C. § 7607(d)(1) .......................................................................................6, 14, 21

42 U.S.C. § 7607(d)(3) ..............................................................................................14

42 U.S.C. § 7607(d)(4) ..............................................................................................14

42 U.S.C. § 7607(d)(5) .........................................................................................6, 14, 21

42 U.S.C. § 7607(d)(6) .......................................................................................................14

42 U.S.C. § 7607(h) ............................................................................................6, 14, 21

## LEGISLATIVE HISTORY

H.R. Rep. 101-490 (1990),
   *reprinted in* Committee on Environment and Public Works, 2 Legislative History
   of the Clean Air Act Amendments of 1990, 3021 (1993)....................................................2

S. Rep. 101-228 (1989),
   *reprinted in* 1990 U.S.C.C.A.N. 3385 .........................................................2, 3, 6, 7, 9, 14

## FEDERAL REGISTER NOTICES

57 Fed. Reg. 31,576 (July 16, 1992),
   Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act
   Amendments of 1990...........................................................................................................7

71 Fed. Reg. 59,302 (Oct. 6, 2006),
   National Emission Standards for Hazardous Air Pollutants for Area Sources:
   Polyvinyl Chloride and Copolymers Production, Primary Copper Smelting,
   Secondary Copper Smelting, and Primary Nonferrous Metals–Zinc, Cadmium,
   and Beryllium....................................................................................................................23

72 Fed. Reg. 2930 (Jan. 23, 2007),
   National Emission Standards for Hazardous Air Pollutants for Area Sources:
   Polyvinyl Chloride and Copolymers Production, Primary Copper Smelting,
   Secondary Copper Smelting, and Primary Nonferrous Metals: Zinc, Cadmium,
   and Beryllium....................................................................................................................23

72 Fed. Reg. 16,636 (Apr. 4, 2007),
   National Emission Standards for Hazardous Air Pollutants for Area Sources:
   Acrylic and Modacrylic Fibers Production, Carbon Black Production, Chemical
   Manufacturing: Chromium Compounds, Flexible Polyurethane Foam Production
   and Fabrication, Lead Acid Battery Manufacturing, and Wood Preserving.....................23

72 Fed. Reg. 38,864 (July 16, 2007),
   National Emission Standards for Hazardous Air Pollutants for Area Sources:
   Acrylic and Modacrylic Fibers, Production Carbon Black Production, Chemical
   Manufacturing: Chromium Compounds, Flexible Polyurethane Foam Production
   and Fabrication, Lead Acid Battery Manufacturing, and Wood Preserving.....................23

73 Fed. Reg. 29,184 (May 20, 2008),
      National Ambient Air Quality Standards for Lead ...........................................................23

73 Fed. Reg. 66,964 (Nov. 12, 2008),
      National Ambient Air Quality Standards for Lead ...........................................................23

74 Fed. Reg. 34,404 (July 15, 2009),
      Primary National Ambient Air Quality Standards for Nitrogen Dioxide .........................24

74 Fed. Reg. 64,810 (Dec. 8, 2009),
      Primary National Ambient Air Quality Standard for Sulfur Dioxide ...............................23

75 Fed. Reg. 6474 (Feb. 9, 2010),
      Primary National Ambient Air Quality Standards for Nitrogen Dioxide .........................24

75 Fed. Reg. 35,520 (June 22, 2010),
      Primary National Ambient Air Quality Standard for Sulfur Dioxide ...............................23

78 Fed. Reg. 66,108 (Nov. 4, 2013),
      National Emission Standards for Hazardous Air Pollutants Residual Risk and
      Technology Review for Flexible Polyurethane Foam Production ....................................22

79 Fed. Reg. 17,340 (Mar. 27, 2014),
      National Emission Standards for Hazardous Air Pollutant Emissions: Group IV
      Polymers and Resins; Pesticide Active Ingredient Production; and Polyether
      Polyols Production ...................................................................................................16, 17

79 Fed. Reg. 48,074 (Aug. 15, 2014),
      National Emission Standards for Hazardous Air Pollutants Residual Risk and
      Technology Review for Flexible Polyurethane Foam Production ....................................22

79 Fed. Reg. 60,238 (Oct. 6, 2014),
      National Emission Standards for Hazardous Air Pollutants: Ferroalloys
      Production ....................................................................................................................22

80 Fed. Reg. 37,366 (June 30, 2015),
      National Emission Standards for Hazardous Air Pollutants: Ferroalloys
      Production ....................................................................................................................22


FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a) ..............................................................................................................15

Fed. R. Civ. P. 56(c)(1)(A) .....................................................................................................15

**OTHER**

EPA, EPA-453/R-99-001, Residual Risk Report to Congress (Mar. 1999) .............................6

EPA, EPA-456/R-14-001, National Air Toxics Program: The Second Integrated
   Urban Air Toxics Report to Congress (2014)...............................................................7, 25

EPA, Substances Listed in the Thirteenth Report on Carcinogens (2014) ..............................9

Government Accountability Office, GAO-06-669, EPA Should Improve the
   Management of Its Air Toxics Program (2006)....................................................................7

Hon. Henry A. Waxman, An Overview of the Clean Air Act Amendments of 1990,
   21 Envtl. L. 1721 (1991)..................................................................................................3, 5

## INTRODUCTION

The U.S. Environmental Protection Agency ("EPA") has failed Americans living near thousands of large industrial facilities by disregarding duties explicitly mandated by the Clean Air Act to limit the release of highly toxic pollutants into the air and neighboring communities. Specifically, EPA has failed to perform rulemakings to review and determine whether to set stronger emission standards for the hazardous air pollutants that major industrial sources emit. 42 U.S.C. § 7412(d)(6), (f)(2).  Hazardous air pollutants include carcinogens and other neurotoxins which have no safe level of human exposure.  These long-overdue rulemakings are essential to the framework Congress designed to protect the public and the environment from such threats.

Plaintiffs California Communities Against Toxics, Californians Against Waste Foundation, Coalition For A Safe Environment, Del Amo Action Committee, Desert Citizens Against Pollution, Louisiana Bucket Brigade, Louisiana Environmental Action Network, Neighbors For Clean Air, and Ohio Citizen Action (collectively, "Plaintiffs") respectfully ask this Court to order EPA to complete the required rulemakings by the deadlines set forth below. Until EPA takes the actions required by federal law, people facing the threat of serious illness and death from exposures to hazardous air pollution will lose the important protections the Act directed EPA to provide from toxic air pollution and the health problems it causes.  Judicial relief is needed to end EPA's ongoing violations and afford people the protections that Congress intended the Clean Air Act to provide.

## STATEMENT OF FACTS AND LEGAL FRAMEWORK

**I.    THE CLEAN AIR ACT OBLIGATES EPA TO PERFORM IMPORTANT RULEMAKINGS TO PROTECT PUBLIC HEALTH AND THE ENVIRONMENT FROM TOXIC AIR POLLUTION.**

When Congress passed the Clean Air Act Amendments of 1990, it found that "emissions of toxic air pollutants" present "exceptionally high levels of risk" of cancer and other "serious illnesses." *See* H.R. Rep. 101-490, at 151-54 (1990), *reprinted in* Committee on Environment and Public Works, 2 Legislative History of the Clean Air Act Amendments of 1990, 3021, 3175-78 (1993). Congress found that 190,000 of the Americans alive in 1989, and potentially as many as half a million people, could be expected to get cancer from exposure to toxic air pollutants. S. Rep. 101-228, at 128-29 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3513-14. Hazardous air pollutants—substances like arsenic, benzene, formaldehyde, and mercury—are harmful at very low levels, and many have no safe level of exposure.

Prior to the Clean Air Act Amendments of 1990, the Clean Air Act ("Act" or "CAA") afforded EPA wide latitude to identify toxic pollutants and set standards to restrict their emissions. EPA's implementation of these requirements was such a failure that in 1990 Congress enacted new legislation to compel EPA action:

> In the 20 years since [the Clean Air Act] was enacted, EPA has acted to establish standards under section [7412] for seven hazardous air pollutants. This is only a small fraction of the many substances associated … with cancer, birth defects, neurological damage, or other serious health impacts.

H.R. Rep. 490 at 151-54; *see also* S. Rep. 101-228, at 128, 1990 U.S.C.C.A.N. at 3513 ("The law has worked poorly. In 18 years, EPA has regulated only some sources of only seven chemicals.").

Congress responded to EPA's utter failure to protect Americans from toxic air pollution by stripping EPA of much of its discretion and designing a new framework for regulation.  S. Rep. 101-228, at 132-33, 1990 U.S.C.C.A.N. at 3517-18 (making "fundamental changes in the basic provisions" of the Clean Air Act in response to EPA's "record of false starts and failed opportunities"); *see also Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) (explaining that "the text, history and structure of section 112," 42 U.S.C. § 7412, show Congress intended to "[e]liminat[e] much of EPA's discretion").  In the 1990 Amendments, Congress enacted statutory requirements for EPA to take specific actions by firm deadlines to "force[] regulatory action."  S. Rep. 101-228, at 156, 1990 U.S.C.C.A.N. at 3541; *see also id.* at 127-33, 1990 U.S.C.C.A.N. at 3512-18; Hon. Henry A. Waxman, An Overview of the Clean Air Act Amendments of 1990, 21 Envtl. L. 1721, 1742 (1991) ("To an extent unprecedented …, the pollution control programs of the 1990 Amendments include very detailed mandatory directives to EPA, rather than more general mandates or broad grants of authority that would allow for wide latitude in EPA's implementation of the [Clean Air Act's] programs.").

By statute, Congress first listed 189 hazardous air pollutants for regulation.  42 U.S.C. § 7412(b)(1).[1]  The 1990 Amendments also required EPA to publish an initial list of all categories of major sources of hazardous air pollutants within one year and then periodically revise the list.  *Id.* § 7412(c)(1).[2]  Then, for each category of major sources of hazardous air pollutants that EPA lists, EPA must promulgate emission standards that reduce each listed hazardous air pollutant by the "maximum degree" that is "achievable" considering cost and other

---

[1] The term "hazardous air pollutant" is defined as "any air pollutant listed pursuant to [§ 7412(b)]."  42 U.S.C. § 7412(a)(6).

[2] A "major source" is defined as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  *Id.* § 7412(a)(1).

3

factors.  *Id.* § 7412(d)(2).  To ensure these standards are sufficiently protective, the Act requires

that emission standards for new sources must be at least as stringent as what the best single

performing source has achieved in practice, regardless of what EPA considers "achievable."  *Id.*

§ 7412(d)(3).  Likewise, it provides that emission standards for existing sources must be at least

as stringent as the average emission limitation that the relevant group of best-performing (*i.e.*,

lowest-emitting) sources have achieved.  *Id.*; *see also, e.g.*, *Cement Kiln Recycling Coal. v. EPA*,

255 F.3d 855, 857-58, 861 (D.C. Cir. 2001); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 629 (D.C.

Cir. 2000).

The 1990 Amendments enacted specific deadlines which required EPA to develop and

issue a large number of emission standards within a short time period.  Congress directed EPA to

complete emission standards for 40 source categories within just two years.  42 U.S.C.

§ 7412(e)(1)(A).  Congress mandated a schedule for completing the remaining emission

standards in four phases, with the last and final set of standards for all then-listed categories due

no later than 2000.  *Id.* § 7412(e)(1)(B)-(E); *see also* tbl.A, *infra* 7.  For source categories that

EPA lists later (*i.e.*, after 2000 and EPA's completion of the initial list), EPA must promulgate

emission standards "within 2 years after the date on which such category or subcategory is

listed."  42 U.S.C. § 7412(c)(5).

The framework enacted in the 1990 Amendments continues after these initial emission

standards are set for industrial source categories.  Congress put in place an ongoing process of

revisiting and reevaluating toxic pollution limits to ensure strong current protections for people's

health and the environment.  Central to this statutory design are the rulemakings required by 42

U.S.C. § 7412(d)(6) and § 7412(f)(2) and at issue in this case.

First, Congress enacted measures to keep emission standards up to date over time as improvements in pollution control occur.  *Id.* § 7412(d)(6).  These measures ensure that limits on toxic pollution are not frozen at the levels achievable by the technology that was in use at the time EPA first set standards.  The Act requires EPA to review the standards and determine whether to revise the standards according to a specific schedule, at least every eight years.  Specifically, "the Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years."  *Id.*  Under this provision, the Administrator is required either to promulgate revised § 7412(d) standards or to issue a final determination not to revise the existing standards based upon a published finding that revision is not "necessary" to ensure the emission standards satisfy § 7412(d) of the Act.  *Id.*  The § 7412(d)(6) requirement reflects Congress's intent that air toxics emission standards evolve as technology and other pollution control methods improve and sources are able to achieve greater pollution reductions.  *Id.*; *see* Waxman, 21 Envtl. L. at 1775-76 & n.256 (explaining that by including § 7412(d)(6) Congress intended that: "the continual tightening of existing source standards will be assured").

Second, the Clean Air Act also requires EPA to revisit emission standards within eight years of their adoption to assess whether more emission reductions are required to protect people's health and prevent environmental harm.  The Act directs EPA to consider "the risk to public health remaining" under the technology-based § 7412(d) standards.  42 U.S.C. § 7412(f)(1).  To address this harm, the Act provides that EPA must "promulgate standards for [each] category or subcategory if … required in order to provide an ample margin of safety to protect public health … or to prevent … an adverse environmental effect."  *Id.* § 7412(f)(2)(A); *see also id.* § 7412(f)(2)(C) ("The Administrator shall determine whether or not to promulgate

such standards."); S. Rep. 101-228, at 148, 1990 U.S.C.C.A.N. at 3533 ("EPA is to tighten the emission limitation" if threats to public health or the environment "remain[] after technology standards are implemented").  The Act mandates that EPA promulgate § 7412(f)(2) standards, or determine not to promulgate such standards, "within 8 years after promulgation" of § 7412(d) standards for each source category.  42 U.S.C. § 7412(f)(2)(A), (f)(2)(C).  Under § 7412(f)(2), EPA is therefore required either to set new standards that will protect the public with an ample margin of safety or to determine that such standards are not required.[3]

To fulfill its § 7412(d)(6) and § 7412(f)(2) rulemaking obligations, among other things, EPA must provide public notice, publish information in the docket, consider and address public comments received, and promulgate a final rule or determination according to the administrative process provided in the Clean Air Act.  *Id.* § 7607(d)(1), (d)(5), (h).

Because Congress required EPA to issue emission standards for all source categories first listed by EPA by 2000, *id.* § 7412(e)(1), Congress intended that EPA complete the 8-year reviews and rulemakings under § 7412(d)(6) and § 7412(f)(2) for all categories no later than 2008.  Had EPA complied with the Clean Air Act's deadlines for promulgating the emission standards, the agency would have been obligated to perform rulemakings of those emission standards on the schedule in Table A, below:

---

[3] It is undisputed that EPA's regulatory duties under 42 U.S.C. § 7412(f)(2) were triggered by Congress's failure to act on EPA's recommendations, which EPA submitted to Congress in 1999.  *See* Compl. ¶ 24 (Apr. 8, 2015) (DKT#1); Answer ¶ 24 (Sept. 21, 2015) (DKT#21); EPA, EPA-453/R-99-001, *Residual Risk Report to Congress* (Mar. 1999), *available at* http://www.epa.gov/airtoxics/rrisk/risk_rep.pdf.

| Table A:  Deadlines And Review Schedule For § 7412(d) Emission Standards | | | |
|---|---|---|---|
| Statutory Provision (42 U.S.C.) | Number of Major Source Categories | Statutory Deadline For § 7412(d) Emission Standards | Latest Date For § 7412(d)(6) And § 7412(f)(2) Rules |
| § 7412(e)(1)(A) | 40 or more initially listed categories | Within 2 years, by: Nov. 15, 1992 | Nov. 15, 2000 |
| § 7412(e)(1)(B) | 1 (coke oven batteries) | Not later than Dec. 31, 1992 | Dec. 31, 2000 |
| § 7412(e)(1)(C) | 25% of categories initially listed | Within 4 years, by: Nov. 15, 1994 | Nov. 15, 2002 |
| § 7412(e)(1)(D) | Additional 25% of categories initially listed | Within 7 years, by: Nov. 15, 1997 | Nov. 15, 2005 |
| § 7412(e)(1)(E) | All remaining categories initially listed[4] | Within 10 years, by: Nov. 15, 2000 | Nov. 15, 2008 |
| § 7412(c)(5) | All individual categories listed after the initial list | Within 2 years of listing | Within 8 years of adoption of standards |

EPA's track record of meeting these mandates has been dismal.  *See* Gov't Accountability Office ("GAO"), GAO-06-669, *EPA Should Improve the Management of Its Air Toxics Program* Highlights, 4-5 (2006) (Pls. ex. 1) (concluding that EPA had made implementation of the air toxics mandates of the Clean Air Act a "low priority relative to other programs").  From the outset, EPA delayed issuance of many of the emission standards for major source categories several years past the deadlines set by Congress.  *Id.*  Despite evidence that health threats remain after putting emission standards in place, EPA also failed to perform reviews and updates of emission standards on the Act's timeline.  *Id.*; *see also* EPA, EPA-456/R-14-001, *National Air Toxics Program: The Second Integrated Urban Air Toxics Report to*

---

[4] EPA initially listed more than 160 major source categories.  57 Fed. Reg. 31,576 (July 16, 1992).  Congress had expected there could be 200 to 250 major source categories.  S. Rep. 101-228, at 148, 1990 U.S.C.C.A.N. at 3533.

*Congress* xv, 3-17 to 3-19 (2014) (Pls. ex. 2) (according to EPA, 13.8 million Americans face an increased cancer risk of 100 in a million or greater due to exposure to high levels of remaining toxic air pollutants around major industrial sources in urban and other geographic areas). To this day, EPA still has not performed dozens of such reviews and rulemakings.[5]

## II.     EPA HAS A LEGAL DUTY TO COMPLETE RULEMAKINGS FOR THE 20 MAJOR AIR TOXICS SOURCE CATEGORIES AT ISSUE IN THIS CASE.

This case concerns overdue rulemakings for 20 of the categories of major sources of hazardous air pollutants that EPA has listed for regulation under the Clean Air Act. These categories are set forth in Table B, below. These source categories span a wide range of operations, including chemical and petrochemical plants and distribution centers, heavy manufacturing facilities, iron and steel plants, and municipal landfills. The several thousands of facilities in these categories are located throughout the country. It is undisputed that each facility within these categories releases into the air each year tons of toxic pollutants that can harm human health. Answer ¶¶ 1, 29-33 (Sept. 21, 2015) (DKT#21); 42 U.S.C. § 7412(a)(1) (to qualify as a major source, a facility must emit or have the potential to emit 10 tons per year of any single type of hazardous air pollutant, or 25 tons per year of any combination of hazardous air pollutants).

Air pollutants from these sources include substances known to cause cancer in exposed people, such as arsenic, benzene, formaldehyde, and vinyl chloride. Answer ¶¶ 29-30 (admitting

---

[5] This lawsuit is one of several actions brought against EPA in recent years for its failure to complete dozens of § 7412(d)(6) and § 7412(f)(2) rulemakings. *See, e.g.*, Sierra Club v. Johnson, No. 09-cv-00152 SBA (N.D. Cal. filed Jan. 13, 2009, consent decree entered Sept. 26, 2011); WildEarth Guardians v. Jackson, No. 1:09-cv-00089-CKK (D.D.C. filed Jan. 14, 2009, consent decree entered Feb. 4, 2010); Air Alliance Houston v. Jackson, No. 1:12-cv-01607-RMC (D.D.C. filed Sept. 27, 2012, consent decree entered Feb. 4, 2014); Sierra Club v. McCarthy, No. 1:13-cv-01639-RDM (D.D.C. filed Oct. 24, 2013, consent decree entered Oct. 6, 2015); Sierra Club v. McCarthy, No. 3:15-cv-01165-HSG (N.D. Cal. filed Mar. 12, 2015, taken under submission Oct. 1, 2015).

facts alleged at Compl. ¶¶ 29-30 (Apr. 8, 2015) (DKT#1)); EPA, *Substances Listed in the*

*Thirteenth Report on Carcinogens* i-ii (2014) (Pls. ex. 3).   EPA admits that carcinogens have no

safe level of human exposure.   Answer ¶ 30; *see also* S. Rep. 101-228, at 175, 1990

U.S.C.C.A.N. at 3560 ("Federal Government health policy since the mid-1950s has been

premised on the principle that there is no safe level of exposure to a carcinogen").   In addition to

cancer, exposure to pollutants released from these sources can cause respiratory disorders,

neurological problems, organ damage, developmental and reproductive harms (including birth

defects), and other serious disease.   Answer ¶ 30 (admitting facts alleged at Compl. ¶ 30).

Mercury and other metals emitted into the air from some of these sources accumulate and

persist in the environment and can harm birds and other wildlife and plants.   *Id.* ¶ 32 (admitting

facts alleged at Compl. ¶ 32).   In addition to inhaling mercury, people come in contact with

mercury by consuming contaminated fish and shellfish.   *Id.*   EPA has determined that pregnant

women and developing fetuses and young children are particularly vulnerable to mercury

exposure.   *Id.*   Congress cited the health and environmental harms from mercury as a motivation

for adopting the 1990 Amendments.   S. Rep. 101-228, at 131-33, 1990 U.S.C.C.A.N. at 3515-18.

It is undisputed that EPA promulgated the hazardous air pollutant standards pursuant to

42 U.S.C. § 7412(d) for these 20 source categories on the dates listed in Table B, below.   Answer

¶ 34.

It is also undisputed that EPA did not complete the § 7412(d)(6) and § 7412(f)(2)

rulemakings for these 20 source categories within 8 years of promulgating emission standards

(*i.e.*, by the deadlines shown in Table B).   *Id.* ¶¶ 36-46, 48-56.   Moreover, EPA does not dispute

that it has not completed these rulemakings to date.   *Id.*

| Table B:  Source Categories Covered By This Action | | |
|---|---|---|
| **Source Category** | **Date Of Promulgation Of Emission Standard** | **Deadline For § 7412(d)(6) And § 7412(f)(2) Rulemakings** |
| 1.  Solvent Extraction for Vegetable Oil Production, 66 Fed. Reg. 19,006 (codified at 40 C.F.R. Part 63 Subpart GGGG) | Apr. 12, 2001 | Apr. 12, 2009 |
| 2.  Boat Manufacturing, 66 Fed. Reg. 44,218 (codified at 40 C.F.R. Part 63 Subpart VVVV) | Aug. 22, 2001 | Aug. 22, 2009 |
| 3.  Surface Coating of Metal Coil, 67 Fed. Reg. 39,794 (40 C.F.R. Part 63 Subpart SSSS) | June 10, 2002 | June 10, 2010 |
| 4.  Cellulose Products Manufacturing, 67 Fed. Reg. 40,044 (40 C.F.R. Part 63 Subpart UUUU) | June 11, 2002 | June 11, 2010 |
| 5.  Generic MACT II - Ethylene Production, 67 Fed. Reg. 46,258 (40 C.F.R. Part 63 Subpart UU, XX, YY) | July 12, 2002 | July 12, 2010 |
| 6.  Paper and Other Web Coating, 67 Fed. Reg. 72,330 (40 C.F.R. Part 63 Subpart JJJJ) | Dec. 4, 2002 | Dec. 4, 2010 |
| 7.  Municipal Solid Waste Landfills, 68 Fed. Reg. 2227 (40 C.F.R Part 63 Subpart AAAA) | Jan. 16, 2003 | Jan. 16, 2011 |
| 8.  Hydrochloric Acid Production, 68 Fed. Reg. 19,076 (40 C.F.R. Part 63 Subpart NNNNN) | Apr. 17, 2003 | Apr. 17, 2011 |
| 9.  Reinforced Plastic Composites Production, 68 Fed. Reg. 19,375 (40 C.F.R. Part 63 Subpart WWWW) | Apr. 21, 2003 | Apr. 21, 2011 |
| 10. Asphalt Processing and Asphalt Roofing Manufacturing, 68 Fed. Reg. 22,976 (40 C.F.R. Part 63 Subpart LLLLL) | Apr. 29, 2003 | Apr. 29, 2011 |
| 11. Integrated Iron and Steel Manufacturing, 68 Fed. Reg. 27,646 (40 C.F.R. Part 63 Subpart FFFFF) | May 20, 2003 | May 20, 2011 |
| 12. Engine Test Cells/Stands, 68 Fed. Reg. 28,774 (40 C.F.R. Part 63 Subpart PPPPP) | May 27, 2003 | May 27, 2011 |
| 13. Site Remediation, 68 Fed. Reg. 58,172 (40 C.F.R. Part 63 Subpart GGGGG) | Oct. 8, 2003 | Oct. 8, 2011 |

| Table B:  Source Categories Covered By This Action | | |
|---|---|---|
| **Source Category** | **Date Of Promulgation Of Emission Standard** | **Deadline For § 7412(d)(6) And § 7412(f)(2) Rulemakings** |
| 14. Miscellaneous Organic Chemical Manufacturing, 68 Fed. Reg. 63,852 (40 C.F.R. Part 63 Subpart FFFF) | Nov. 10, 2003 | Nov. 10, 2011 |
| 15. Surface Coating of Metal Cans, 68 Fed. Reg. 64,432 (40 C.F.R. Part 63 Subpart KKKK) | Nov. 13, 2003 | Nov. 13, 2011 |
| 16. Surface Coating of Miscellaneous Metal Parts and Products, 69 Fed. Reg. 130 (40 C.F.R. Part 63 Subpart MMMM) | Jan. 2, 2004 | Jan. 2, 2012 |
| 17. Organic Liquids Distribution (Non-Gasoline), 69 Fed. Reg. 5038 (40 C.F.R. Part 63 Subpart EEEE) | Feb. 3, 2004 | Feb. 3, 2012 |
| 18. Stationary Combustion Turbines, 69 Fed. Reg. 10,512 (40 C.F.R. Part 63 Subpart YYYY) | Mar. 5, 2004 | Mar. 5, 2012 |
| 19. Surface Coating of Plastic Parts and Products, 69 Fed. Reg. 20,968 (40 C.F.R. Part 63 Subpart PPPP) | Apr. 19, 2004 | Apr. 19, 2012 |
| 20. Surface Coating of Automobiles and Light-Duty Trucks, 69 Fed. Reg. 22,602 (40 C.F.R. Part 63 Subpart IIII) | Apr. 26, 2004 | Apr. 26, 2012 |

**JURISDICTION, NOTICE, VENUE, AND STANDING**

Plaintiffs bring this suit under the Clean Air Act's citizen suit provision, which authorizes district courts to hear actions brought by "any person" to compel EPA's performance of "any act or duty" under the Act "which is not discretionary with [EPA]."  42 U.S.C. § 7604(a), (a)(2). EPA's failures to take the actions required by § 7412(d)(6) and § 7412(f)(2) are failures to perform acts and duties which are not discretionary, as explained herein.  Thus, the Clean Air Act provides this Court with jurisdiction to hear this action and order EPA to come into compliance with the Act.

11

Plaintiffs satisfied the notice requirements for bringing this action. *See* Letter from Earthjustice to Gina McCarthy, Administrator, EPA (Feb. 3, 2015) (Pls. ex. 4); Answer ¶ 4 (admitting that Plaintiffs posted a certified letter to EPA dated February 3, 2015). More than 60 days have passed since the notice was provided, and EPA has continued its failures to fulfill its mandatory duties.

Venue is proper in this Court because EPA resides in this district. 28 U.S.C. § 1391(e)(1); Answer ¶ 5 (admitting that EPA Administrator McCarthy, in her official capacity, resides in the District of Columbia).

To have standing to bring this suit, Plaintiffs must show (1) an injury in fact that is actual or imminent, not conjectural or hypothetical, (2) that is fairly traceable to EPA's challenged action (or lack thereof), and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs have standing here to sue on behalf of their members. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007). Plaintiffs' members live and engage in recreation near facilities in each of the 20 source categories. *See* Standing Decls. (Pls. exs. 7-27). These members suffer exposure to hazardous air pollutants released by those sources and other harm to their health, recreational, aesthetic, and other interests. *See id.*; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-85 (2000) (members' reasonable concerns about the effects of pollutant discharges on their recreational and aesthetic interests are sufficient to confer standing on environmental group); *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014) (Sierra Club has standing where members spend time near polluting facilities and "are concerned about the emissions' effects on their health").

These injuries to Plaintiffs' members' physical well-being and recreational and other interests are "traceable" to EPA's failures to complete the required regulatory actions, and strengthen existing emission standards as required.  EPA's continuing failures to act prolong and increase Plaintiffs' members' exposure to hazardous air pollutants and the resulting harms they suffer.  Compelling EPA to fulfill its legal duties would redress these injuries.  Completing the regulatory actions and duties at issue would likely reduce Plaintiffs' members' exposures to harmful pollution; reduce environmental damage in their communities from pollution; reduce their reasonable concerns about this pollution; and reduce their recreational, aesthetic, and other harms caused by EPA's failures to regulate these sources' emissions effectively.  *See* Standing Decls. (Pls.' exs. 7-27); *see also, e.g.*, *Laidlaw*, 528 U.S. at 187.

Moreover, Plaintiffs have standing because EPA's failures to issue the required reviews and rulemakings deny Plaintiffs procedures designed to protect Plaintiffs' and their members' concrete health, recreational, aesthetic, and other substantive interests described above. *Defenders of Wildlife*, 504 U.S. at 572 n.7; *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (when enforcing procedural rights, normal standards for "redressability and imminence" are "relax[ed]"); *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (environmental organization had standing where denied notice-and-comment rulemaking procedure in which EPA would be required "to entertain and respond to … claims about the necessary scope and stringency of [emission] standards").  Procedures guaranteed by the Clean Air Act include a final rulemaking action to review and determine whether to set stronger air emission standards, including through evaluating pollution control developments and health and environmental risks, as well as a right to public notice and comment on that rulemaking and to judicial review of final action resulting from it.  42 U.S.C. § 7607(d)(3), (d)(5), (h).  The very

purpose of these procedures is to direct EPA to issue stronger regulatory protections where required to "provide an ample margin of safety to protect public health" or "prevent … an adverse environmental effect" and when necessary to keep pace with "developments" in methods to reduce pollution. *Id.* § 7412(d)(6), (f)(2); *see also id.* § 7401; S. Rep. 101-228, at 148, 1990 U.S.C.C.A.N. at 3533. An order compelling EPA to perform the required rulemakings will redress the foregoing injuries because it will provide Plaintiffs with their statutorily guaranteed procedural rights and with rulemakings that are likely to lead to stronger regulatory protections.

In addition, EPA's failures to publish the required proposed and final rulemakings and disclose the supporting data and analysis deprive Plaintiffs and their members of information that the mandatory reviews and rulemakings would make publicly available. Standing Decls. (Pls. exs. 7-27). This is information to which they are legally entitled. 42 U.S.C. § 7607(d)(1), (d)(3)-(6). EPA must provide this information because the statute requires EPA to review and make determinations based on particular information, and thus publicly disclose such information as part of these rulemakings. *Id.* § 7412(d)(6) (requiring EPA to "review" the existing standards and to consider "developments in practices, processes, and control technologies"); *id.* § 7412(f)(2) (requiring EPA to consider various pieces of information, including levels of "cancer risks," and what is required "to provide an ample margin of safety to protect public health"). Thus, EPA's failures to act and publish this information cause Plaintiffs and their members injury, which would be redressed by an order compelling EPA to act. *See Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (denial of information under the Clean Air Act is an injury sufficient for standing where the information must "be publicly disclosed" and there "is no reason to doubt their claim that the information would help them"); *see also People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015) (denial of access

to information about welfare of birds is an injury sufficient for standing because it prevented organization from being able to bring problems to regulator's attention and to continue to educate the public).

## ARGUMENT

Plaintiffs are entitled to summary judgment as a matter of law.  EPA has non-discretionary duties under the Clean Air Act to complete the § 7412(d)(6) and § 7412(f)(2) rulemakings for the 20 source categories that became due three to six years ago.  There is no dispute that EPA has failed to and continues to fail to take these actions.  Answer ¶¶ 36-46, 48-56.  Therefore, this Court should grant the remedy provided in § 7604(a).

## I.  SUMMARY JUDGMENT ON LIABILITY SHOULD BE ENTERED FOR PLAINTIFFS.

### A.  Legal Standard

Summary judgment must be granted when, viewing the facts in the light most favorable to the nonmoving party, the records show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to cite "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *accord* Fed. R. Civ. P. 56(c)(1)(A); *see also Ali v. Tolbert*, 636 F.3d 622, 627-28 (D.C. Cir. 2011).

### B.  It Is Undisputed That EPA Has Failed To Complete Clean Air Act Rulemakings As Required By § 7412(d)(6) And § 7412(f)(2) For The 20 Source Categories.

Because EPA has not performed non-discretionary acts and duties for the 20 air toxics source categories, Plaintiffs are entitled to summary judgment and an order finding EPA liable for violating the Clean Air Act.  42 U.S.C. § 7604(a).

EPA has non-discretionary duties under the Clean Air Act to perform the § 7412(d)(6) and § 7412(f)(2) reviews and rulemakings for these 20 source categories, as for all other major sources of air toxics. *Id.* § 7412(d)(6), (f)(2). The Act requires EPA to complete these rulemakings no later than eight years after standards are set. *Id.* § 7412(d)(6), (f)(2). EPA set standards for these source categories between 2001 and 2004, on the dates listed in Table B, column 2, *supra* 10-11. Therefore, the deadlines for completing these actions were eight years later, as listed in Table B, column 3, *supra* 10-11. All of these deadlines passed years ago without EPA action.

EPA has failed to complete each of these required actions for the 20 categories of major industrial polluters by the Clean Air Act's unambiguous deadlines. EPA has conceded these key facts. *See* Answer ¶¶ 1, 36-46, 48-56. No more is needed to prove EPA's liability.

Further, it is plain that the overdue regulatory actions are mandatory. Each statutory provision uses the unequivocal term "shall" to direct the rulemaking actions and requirements at issue. 42 U.S.C. § 7412(d)(6), (f)(2). The term "shall" is inherently mandatory. *See, e.g.*, *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the language of command."); *Natural Res. Def. Council v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993) (same). Congress underscored that these rulemakings are non-discretionary by setting date-certain deadlines by which EPA must perform the required regulatory actions. *See, e.g.*, *Reilly*, 983 F.2d at 266, 268. Thus, Congress left EPA no discretion to forgo making the determinations required by § 7412(d)(6) and § 7412(f)(2) or to prioritize any other actions over the timely completion of these obligations.

Moreover, EPA itself has repeatedly acknowledged that the requirements set forth under § 7412(d)(6) and § 7412(f)(2) are non-discretionary. *See, e.g.*, 79 Fed. Reg. 17,340, 17,341

(Mar. 27, 2014) ("Section 112(d)(6) of the CAA *requires* the EPA to review these regulations …

and revise them as necessary … no less frequently than every 8 years." (emphasis added)); *id.*

("Section 112(f)(2) of the CAA *requires* the EPA to assess the remaining risks … and determine

whether the emission standards provide an ample margin of safety to protect public health within

8 years of promulgation of the original standards." (emphasis added)).

## II.   TO REMEDY EPA'S CONTINUING STATUTORY VIOLATIONS, THIS COURT SHOULD COMPEL EPA TO COMPLETE THE OVERDUE RULEMAKINGS BY PROMPT DEADLINES.

### A.   Legal Standard

Where EPA fails to fulfill a non-discretionary act or duty, the Clean Air Act provides for

a specific form of relief: authorizing district courts "to order the Administrator to perform" the

required act or duty.  42 U.S.C. § 7604(a); *see also Natural Res. Def. Council v. Train*, 510 F.2d

692, 705, 712-13 (D.C. Cir. 1974) (courts have the "authority to set enforceable deadlines both

of an ultimate and intermediate nature" to ensure an agency fulfills its statutory obligations).

A district court should order the agency to correct its ongoing statutory violations by a

date that is as expeditious as possible.  *Train*, 510 F.2d at 705, 712-13.  The agency in violation

of the law carries a "heavy burden" to show that a remedial deadline allowing further delay is the

most expeditious possible schedule, and that faster compliance is "impossible."  *Sierra Club v.*

*Johnson*, 444 F. Supp. 2d 46, 58 (D.D.C. 2006) (citing *Ala. Power Co. v. Costle*, 636 F.2d 323,

359 (D.C. Cir. 1979)); *see also Train*, 510 F.2d at 712-13; *Am. Lung Ass'n v. Browner*, 884 F.

Supp. 345, 347 (D. Ariz. 1994); *Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 898 (N.D. Cal.

1984).[6]

---

[6] The need for EPA to prove "impossibility" derives from the equitable principle that an agency in violation of the law should be held in contempt unless it can "demonstrate[] that [it] [i]s powerless to comply."  *Train*, 510 F.2d at 713; *see also Sierra Club v. Ruckelshaus*, 602 F. Supp.

This is a high hurdle, and courts have frequently found EPA has not cleared it, ordering less time than the agency preferred to satisfy its regulatory duties.  *See, e.g.*, *Sierra Club v. Jackson*, No. 01-1537, 2011 WL 181097, at *1, 4-5, 14 (D.D.C. Jan. 20, 2011) (EPA requested over 14 month extension of court-ordered deadlines, court ordered 1 month extension); *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 88, 95 (D.D.C. 2001) (EPA requested deadlines of up to 16 months, court ordered 45 days), *aff'd sub nom. Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002); *Sierra Club v. Thomas*, 658 F. Supp. 165, 168, 174 (N.D. Cal. 1987) (EPA requested deadline of more than 4 years, court ordered 2 years); *Sierra Club v. Gorsuch*, 551 F. Supp. 785, 787, 789 (N.D. Cal. 1982) (EPA requested deadline of more than 9 years, court ordered 180 days).

A court-ordered deadline "should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources."  *Train*, 510 F.2d at 712.  "[S]hifting resources in response to statutory requirements and court orders is commonplace for EPA."  *Sierra Club v. Johnson*, 444 F. Supp. 2d at 54; *Sierra Club v. Thomas*, 658 F. Supp. at 174.  To prioritize the overdue rulemakings, an agency may need to redirect resources from other regulatory initiatives.  Courts recognize that by setting a strict deadline for the agency to meet, Congress already established the "relative priority" of the overdue rulemakings, and it is "the court's role to enforce [that] legislative will," not to second guess Congress's judgment.  *Sierra Club v. Johnson*, 444 F. Supp. 2d at 54 (quoting *New York v. Gorsuch*, 554 F. Supp. 1060, 1062-63 (S.D.N.Y. 1983)); *see also id.* at 53 ("When Congress expresses its intent that regulations be promulgated by a date certain, that intent is of utmost importance.").

---

at 904 (finding EPA failed to demonstrate that compliance was impossible and holding the EPA Administrator in contempt).

Courts reject as contrary to the statute proposed remedies "that sacrifice the timely implementation of the statute" in favor of extensive procedural steps or analysis by the agency that is not required to meet its regulatory obligations. *Id.* at 53-54. Because a remedy for violating a non-discretionary duty need only assure the minimum time needed for rulemakings to be "substantively adequate," EPA cannot justify extended remedial schedules just by claiming that, with more time, it could write better rules. *Sierra Club v. Jackson*, 2011 WL 181097, at *7.

**B.  The Court Should Compel EPA To Perform The Overdue Rulemakings Within One To Two Years.**

Rulemakings for the 20 source categories are already years past the deadlines imposed by Congress, and every day of additional delay prolongs the exposure of Plaintiffs' members and the public to harmful air pollution and all related harms. Accordingly, this Court should set prompt deadlines to obtain compliance within the fastest possible timeframe, using all resources at the agency's disposal to speed the agency's work. *Train*, 510 F.2d at 705, 712-13.

In particular, Plaintiffs respectfully request that this Court order EPA to meet the following schedule:

- For 10 of the overdue source categories, issue notices of proposed rules within 8 months of the Court's order and promulgate final rules within 1 year; and

- For the remaining 10 source categories, issue notices of proposed rules within 20 months of the Court's order, and promulgate final rules within 2 years.

One year is more than enough time for EPA to perform the straightforward § 7412(d)(6) and § 7412(f)(2) reviews for each major source category from start to finish. Further, phasing EPA's duties over two years rather than one provides the agency with flexibility as to how to meet its obligations. EPA may choose to immediately begin work on all of the source categories, and take up to two years for those categories for which EPA would prefer additional time. Or,

EPA may choose to stagger its work and focus on a subset of source categories each year, so that the agency is not working on all of the rulemakings at the same time.

### 1. EPA Cannot Meet Its Burden To Prove That The Requested Deadlines Are Impossible To Meet.

EPA cannot meet its burden to show it is "impossible" to meet the deadlines of one to two years described above.

First, any such argument would be inconsistent with the statutory framework itself. Congress has already decided that swift action to set air toxics emission standards is both possible and necessary. Congress contemplated that, starting from scratch, EPA could, within two years, promulgate emission standards for *40 major source categories*. 42 U.S.C. § 7412(e)(1)(A). Within those same two years, Congress also required EPA to issue emission standards for all large municipal waste combustors, small municipal waste combustors, and medical waste incinerators. *Id.* § 7429(a)(1)(B)-(C). Thus, Congress made clear that two years is enough time to complete more than 40 air toxics rulemakings starting from scratch. Further, the Act directs all later-listed sources to have standards within two years of listing, no matter how many new source categories may be listed simultaneously, and no matter how many other rulemakings the agency may be already required to perform during the same timeframe. *Id.* § 7412(c)(5). It follows that EPA can accomplish rulemakings reviewing emission standards for 20 major source categories within two years.

Congress also made it abundantly clear that EPA can, and must, conduct rulemakings for multiple source categories in parallel. Plainly, the Act's regulatory scheme, directing specific reviews and regulatory actions eight years after standards are promulgated, *requires* EPA to manage multiple, and indeed dozens of, air toxics reviews and rulemakings at any given time.

The Act obligates EPA to review all major source categories every eight years.  Had EPA met the deadlines Congress set for adopting emission standards in the first place, EPA would have had to complete § 7412(d)(6) and § 7412(f)(2) rules for 40 or more source categories by 2000, for 25 percent of categories two years later, for another 25 percent (approximately 40 categories) three years later, and for the remaining categories (approximately 40 categories) three years after that.  42 U.S.C. § 7412(e)(1)(A)-(E); *see also* tbl.A *supra*, 7.  Thus, Congress envisioned that every two to three years EPA would complete § 7412(d)(6) and § 7412(f)(2) rules for a substantial number of categories, *i.e.*, potentially up to 40 or more categories.

Second, EPA has had significant practice performing the reviews and rulemakings required by § 7412(d)(6) and § 7412(f)(2) and cannot prove that complying with a one to two year schedule is "impossible."  *Sierra Club v. Johnson*, 444 F. Supp. 2d at 58.  The rulemakings are no more complex than any other Clean Air Act pollution regulation.  Generally, completion of a § 7412(d)(6) technology review entails analyzing new or improved pollution control methods in the particular industry and determining whether revised emission standards are needed.  42 U.S.C. § 7412(d)(6).  Completion of a § 7412(f)(2) residual risk review entails performing health and environmental risk assessments of the harms posed by toxic pollution from the industry, and evaluating the need for additional emission standards or requirements.  *Id.* § 7412(f)(2).

Further, for both types of rulemaking, EPA must follow the same procedural notice-and-comment rulemaking requirements that apply to a host of Clean Air Act actions.  *Id.* § 7607(d)(1), (d)(5), (h) (providing, *inter alia*, that EPA must issue a notice of proposed rulemaking, hold a public comment period, respond to significant comments, and issue a final rule explaining any changes from the proposal).  EPA need not reinvent the wheel to create the

21

rulemaking documents for these actions.  Over the course of numerous recent § 7412(d)(6) and

§ 7412(f)(2) rulemakings, EPA has established standard steps for the review process and created

templates for the primary rulemaking documents that combine both sets of obligations.  *E.g.*,

*compare* 78 Fed. Reg. 66,108 (Nov. 4, 2013) (flexible polyurethane foam production proposed

rule), *with* 79 Fed. Reg. 60,238 (Oct. 6, 2014) (ferroalloys production proposed rule); *compare*

79 Fed. Reg. 48,074 (Aug. 15, 2014) (flexible polyurethane foam production final rule), *with* 80

Fed. Reg. 37,366 (June 30, 2015) (ferroalloys production final rule).

The *Sierra Club v. Johnson* case in this district court illustrates that EPA has performed

multiple notice-and-comment air toxics rulemakings in less time than one to two years, when

required by court order.  In *Johnson*, an organization brought a citizen suit to compel EPA to

promulgate dozens of overdue hazardous air pollutant emission standards for area source

categories.  Area sources are "a larger and more diverse group of smaller entities than major

sources," and, according to EPA, are "especially difficult" to regulate and present "unique

challenges that justify the allowance of additional time" to fashion rules.  *Johnson*, 444 F. Supp.

2d at 56-57.  The parties disputed the remedy, and EPA submitted a signed declaration

requesting a six-year remedial schedule that would have had EPA complete rules for the first

four source categories in less than two years and the next six categories in less than three years.

*Id.* at 54.  The court rejected EPA's schedule and ordered it to comply in nearly half the overall

time EPA claimed it needed, with rules for the first four categories due in less than nine months

and rules for the next six categories due in less than fifteen months.  *Id.* at 61.  Although shorter

than the schedule it requested, EPA met those court-ordered deadlines and issued timely final rules after notice and comment.[7]

EPA also cannot meet its "heavy burden" to show that four months from issuance of the proposed rules to promulgation of the final rules is "impossible." *Id.* at 58. In *Johnson*, when following the same notice-and-comment procedures that apply to the 20 source categories here, EPA took less than three months to accept public comments, prepare responses to significant comments received, and finalize the rules with any warranted changes. *See supra*, n.7. Other courts have determined that four months or less provides sufficient time for EPA to proceed from a proposed to final rule. *See, e.g.*, *Natural Res. Def. Council v. EPA*, 797 F. Supp. 194, 198 (E.D.N.Y. 1992) (ordering EPA to propose rule and then to publish final rule less than 120 days after proposal); *Sierra Club v. Ruckelshaus*, 602 F. Supp. at 899-900 (ordering EPA to issue final rule within 90 days where EPA already had proposed rule).

Furthermore, EPA has consistently completed complex Clean Air Act rulemakings within five to seven months of proposal that adhered to the same rulemaking process as required for the rules for the 20 categories here, but involved far larger records and thousands of comments. Most recently, the lead standard took five months from proposal to final rule, and EPA received more than 6,200 comments. 73 Fed. Reg. 29,184, 29,281 (May 20, 2008) (proposal signed May 1, 2008); 73 Fed. Reg. 66,964, 67,051 (Nov. 12, 2008) (final signed Oct. 15, 2008); EPA, Responses to Significant Comments at 1, EPA-HQ-OAR-2006-0735-5894 (2008) (Pls. ex. 5).[8]

---

[7] 71 Fed. Reg. 59,302, 59,304, 59,321 (Oct. 6, 2006) (proposed rule for first four source categories); 72 Fed. Reg. 2930, 2931, 2943 (Jan. 23, 2007) (final rule for first four source categories); 72 Fed. Reg. 16,636, 16,638, 16,659 (Apr. 4, 2007) (proposed rule for seven additional source categories); 72 Fed. Reg. 38,864, 38,865, 38,899 (July 16, 2007) (final rule for seven additional source categories).

[8] In addition, the sulfur dioxide standard took 6.5 months from proposal to final rule. 74 Fed. Reg. 64,810, 64,869 (Dec. 8, 2009) (proposal signed Nov. 16, 2009); 75 Fed. Reg. 35,520,

Next, EPA cannot demonstrate that resource constraints would make a one to two year schedule "impossible." If needed, EPA can hire contractors to support and advance its work on the mandatory rulemakings, or redirect staff and resources from the many discretionary actions and initiatives it is currently undertaking. *See Sierra Club v. Johnson*, 444 F. Supp. 2d at 57 ("It is inappropriate for an agency to divert to purely discretionary rulemaking resources that conceivably could go towards fulfilling obligations clearly mandated by Congress"). Fully discretionary activities to which EPA has committed resources include creating exemptions for Clean Air Act regulations, supplying slight clarifications of existing requirements, and adjusting internal procedures and policies. *See* EPA, *Spring 2015 Regulatory Agenda*, EPA-HQ-OA-2015-0370-0001 (May 21, 2015) (Pls. ex. 6) (identifying numerous rulemakings as "Legal Deadline: None"). For example, instead of completing the mandatory rulemakings, EPA is working on a discretionary rulemaking to revise the definition of volatile organic compounds so that regulated industries will no longer need to report the release of certain toxic emissions to EPA. *Id.* at 118; *see also id.* at 68-69 (discretionary rulemaking to "help entities interested in conducting training classes to better understand the requirements necessary to be approved to conduct these training courses"); *id.* at 79 (discretionary rulemaking to revise existing policy concerning when EPA regional offices need to maintain consistency).

### 2.    The Requested Deadlines Would Serve The Public's Interest In Achieving The Health-Protective Purposes Of The Clean Air Act.

Requiring EPA to perform rulemakings for the 20 source categories at issue here within one to two years would best match the framework and timing that Congress laid out in the Clean Air Act and would effectuate Congress's goal of achieving clean and healthy air. *See Train*, 510

---

35,592 (June 22, 2010) (final signed June 2, 2010). The nitrogen oxides standard took seven months from proposal to final rule. 74 Fed. Reg. 34,404, 34,459 (July 15, 2009) (proposal signed June 26, 2009); 75 Fed. Reg. 6474, 6531 (Feb. 9, 2010) (final signed Jan. 22, 2010).

F.2d at 713.  Taking any longer than two years to complete these rulemakings would set back the agency's work even further on other rulemaking obligations coming due.  Only prompt deadlines can get the agency back on track and potentially avoid yet another cycle of missed deadlines and the consequent prolonged exposure to toxic pollution being released under outdated standards. Further, it is important not to give EPA more time than the statute has recognized is required. *See Sierra Club v. Johnson*, 444 F. Supp. 2d at 53 (Congress's intent that EPA meet the statute's deadlines is "of utmost importance").  The agency should not be able to benefit from regulatory inaction such that the longer it waits, and the more overdue obligations have accrued due to its Clean Air Act violations, the more time it will have to avoid key regulatory actions intended to protect public health and the environment.

Urgent action is needed to address the ongoing health and environmental threats posed by the thousands of industrial facilities across the country operating under emission standards that EPA set a decade or more ago and has not revisited or updated, as required.  EPA's inaction leaves Plaintiffs and their members without the important health and environmental protections afforded by these rulemakings.  EPA has acknowledged that levels of toxic pollutants in the air remain high around major industrial sources in urban and other geographic areas, showing that additional protection is needed to reduce cancer and other health threats.  EPA, *National Air Toxics Program: The Second Integrated Urban Air Toxics Report to Congress* xv, 3-17 to 3-20. EPA must not be allowed to continue to thwart Congress's statutory mandates to assure that Clean Air Act emission standards for major air toxics sources reflect up-to-date pollution control methods and "provide an ample margin of safety to protect public health" and the environment. 42 U.S.C. § 7412(d)(6), (f)(2)(A).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment, find EPA liable for failing to take the non-discretionary actions described above, and order EPA to perform each required action and duty by the expeditious deadlines set forth in the accompanying proposed order.

DATED:          November 17, 2015          Respectfully Submitted,

                                           /s/ Nicholas Morales
                                           Nicholas Morales (D.C. Bar No. 1003942)
                                           Emma C. Cheuse (D.C. Bar No. 488201)
                                           James S. Pew (D.C. Bar No. 448830)
                                           Earthjustice
                                           1625 Massachusetts Ave., NW, Suite 702
                                           Washington, DC 20036
                                           nmorales@earthjustice.org
                                           echeuse@earthjustice.org
                                           jpew@earthjustice.org
                                           Tel: 202-667-4500
                                           Fax: 202-667-2356

                                           *Attorneys for Plaintiffs*