**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **CALIFORNIA COMMUNITIES** | ) | |
| **AGAINST TOXICS, *et al.*,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-512 (TSC) |
| | ) | |
| **SCOTT PRUITT, Administrator,** | ) | |
| **United States Environmental Protection** | ) | |
| **Agency,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, a number of environmental advocacy groups, bring this action against the

Environmental Protection Agency (EPA) pursuant to the Clean Air Act's citizen suit provision,

42 U.S.C. § 7604(a)(2), to compel the agency to perform rulemakings mandated by the Act to

protect people and the environment from pollution.  Plaintiffs and the EPA have both filed for

summary judgment.  The EPA does not contest liability for the underlying failure to act.  All that

is left for the court to determine, then, is what constitutes an appropriate and reasonable timeline

for the EPA to complete its mandated activity.  Having considered the parties' briefs, their

presentations at the motions hearing held on January 6, 2017, Defendant's supplemental

declaration filed in this case and in case 16-cv-364, and Plaintiffs' response to the supplemental

declaration, Plaintiffs' motion for summary judgment will accordingly be **GRANTED,**

Defendant's cross-motion for summary judgment will be **DENIED**, and Plaintiff's request as to

the specific remedy will be **GRANTED** in part and **DENIED** in part.

I.      **BACKGROUND**

   **A.  Statutory background**

   Congress amended the Clean Air Act (CAA), the comprehensive federal law that

regulates air emissions from stationary and mobile sources, in 1990, creating "an aggressive

regime of new control requirements to address four crucially important air pollution problems:

urban smog, hazardous air pollution, acid rain, and depletion of the stratospheric ozone layer."

The Hon. Henry A. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 ENVTL.

L. 1721, 1723 (1991).  Prior to the amendments, the Act required the EPA "to set risk-based air

pollution standards."  *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 857 (D.C. Cir. 2001).

The amendments abandoned the risk approach and instead required the EPA "to set the most

stringent standards achievable . . . that is, standards 'based on the maximum reduction in

emissions which can be achieved by application of [the] best available control technology.'"  *Id.*

(quoting S. REP. NO. 101–228, at 133 (1989), U.S. Code Cong. & Admin. News at 3385, 3518).

   The amendments set forth a two-step process for regulating hazardous air pollutants, or

"HAPs".  First, the EPA establishes emission floors for each pollutant and source category, and

then the agency sets stricter but "achievable" standards—taking into account "the cost of

achieving such emission reduction, and any non-air quality health and environmental impacts

and energy requirements."  *Id.* at 858; 42 U.S.C. § 7412(d)(2).  With the amendments, Congress

also created a specific list of 189 HAPs for the EPA to regulate, and gave the EPA the authority

to revise the list.  42 U.S.C. § 7412(b).

   The EPA regulates HAPs by regulating different types of sources that emit HAPs.  These

sources include "major sources," which emit the most pollutants, "area sources," which are

stationary sources of HAPs that emit fewer HAPs than major sources; "stationary sources,"

defined as "any building, structure, facility, or installation which emits or may emit any air

pollutant;" and "new sources," defined as "a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations." *Id.* § 7412(a); 42 U.S.C. § 4211. The 1990 amendments required the EPA to publish, within one year of the amendments' 1990 passage, "a list of all categories and subcategories of major sources and area sources . . . of the air pollutants listed pursuant." *Id.* § 7412(c)(1). Additionally, the statute required the agency to "from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information," the list of categories and subcategories of major sources and area sources. *Id.* For each list of categories and sub-categories, the EPA was required to establish emissions standards. *Id.* § 7412(c)(2). The statute required that within five years, the listed sources cover 90% of emissions of the 30 worst HAPs, and regulations of those sources were to be completed within ten years. *Id.* § 7412(c)(3).

The amendments contained a number of additional deadlines. The EPA was to establish standards regulating emissions for 40 source categories within two years; to establish standards for 25 percent of the listed categories within four years; an additional 25 percent within seven years; and the remaining within ten years of November 1990. *Id.* § 7412(e)(1). For new source categories that the EPA would add pursuant to its responsibility to revise the list from time to time, the agency was to promulgate emissions standards within two years of the listing. *Id.* § 7412(c)(5).

The amendments required the EPA to review and revise emissions standards at least every eight years in order to take into account developments in technology—in other words, to review the step one technology "floor"—and either promulgate new standards or determine that new standards were not necessary. *Id.* § 7412(d)(6). The agency was also required to, first, submit a report to Congress within six years of the amendments on the remaining risk to public

health and actual health impact of HAPs, and, if Congress did not act based on the recommendations in that report, review the standards within eight years to determine whether any changes were necessary to "provide an ample margin of safety to protect public health" or to "prevent . . . an adverse environmental effect," subject to considerations like cost—in other words, the step two risk determination. *Id*. § 7412(f)(2)(A).

The process by which the EPA promulgates new standards, or determines that new standards are not necessary, includes public notice and comment—the agency must issue a notice of proposed rulemaking, hold a public comment period, respond to significant comments, and issue a final rule explaining any changes from the proposal. 42 U.S.C. § 7607(d), (h).

**B. Plaintiffs' claim**

Plaintiffs sued the EPA administrator for failure to take mandatory, non-discretionary actions regarding the following 20 listed major source categories:[1]

| Source Category | Date emissions standard promulgated |
| --- | --- |
| Solvent Extraction for Vegetable Oil | April 12, 2001 (66 Fed. Reg. 19,006) |
| Boat Manufacturing | August 22, 2001 (66 Fed. Reg. 44,218) |
| Surface Coating of Metal Coil | June 10, 2002 (67 Fed. Reg. 39,794) |
| Cellulose Products Manufacturing | June 11, 2002 (67 Fed. Reg. 40,044) |
| Ethylene Production | July 12, 2002 (67 Fed. Reg. 46,258) |
| Paper and Other Web Coating | December 4, 2002 (67 Fed. Reg. 72,330) |
| Municipal Solid Waste Landfills | January 16, 2003 (68 Fed. Reg. 2227) |
| Hydrochloric Acid Production | April 17, 2003 (68 Fed. Reg. 19,076) |
| Reinforced Plastic Composites Production | April 21, 2003 (68 Fed. Reg. 19,375) |
| Asphalt Processing & Roofing Manufacturing | April 29, 2003 (68 Fed. Reg. 22,976) |
| Integrated Iron & Steel Manufacturing | May 20, 2003 (68 Fed. Reg. 27,646) |
| Engine Test Cells/ Stands | May 27, 2003 (68 Fed. Reg. 28,774) |
| Site Remediation | October 8, 2003 (68 Fed. Reg. 58,172) |
| Miscellaneous Organic Chemical Manufacturing | November 10, 2003 (68 Fed. Reg. 63,852) |
| Surface Coating of Metal Cans | November 13, 2003 (68 Fed. Reg. 64,432) |

---

[1] The Complaint included a twenty-first major source category about which the parties have stipulated to voluntary dismissal without prejudice: Semiconductor Manufacturing.

| Surface Coating of Miscellaneous Metal Parts and Products | January 2, 2004 (69 Fed. Reg. 130) |
|---|---|
| Organic Liquids Distribution | February 3, 2004 (69 Fed. Reg. 5038) |
| Stationary Combustion Turbines | March 5, 2004 (69 Fed. Reg. 10,512) |
| Surface Coating of Plastic Parts and Products | April 19, 2004 (69 Fed. Reg. 20,968) |
| Surface Coating of Automobiles & Light-Duty Trucks | April 26, 2004 (69 Fed. Reg. 22,602) |

(Pls. Statement of Material Facts, ECF No. 23, ¶ 2); (Def. Resp., ECF No. 31 Attachment 1, at 1).  The parties agree that more than eight years have passed since the promulgation dates of emissions standards for the 20 source categories.  (Pls. Stat. ¶ 3); (Def. Resp. at 1).  The parties agree that the EPA has not completed the reviews required by the statute at § 7412(d)(6) (the regular eight-year review of standards after their promulgation) and § 7412(f)(2) (the residual risk review).  (Pls. Stat. ¶ 4); (Def. Resp. at 1).

### C.  Proposed remedies

#### i.  Plaintiff's proposed timeline

Plaintiffs have proposed a timeline requiring the EPA to complete the overdue rulemakings within one to two years.  Specifically, Plaintiffs' plan would require the agency, for ten of the categories, to issue notices of proposed rules within eight months of the court's order and promulgate final rules within one year; and for the remaining ten categories, to issue notices of proposed rules within 20 months of the court's order and promulgate final rules within two years.

#### ii.  EPA's proposed timeline

The agency has proposed a timeline to complete the rulemakings within five years, as follows:

| Source Category | Original Promulgation | Proposal Date | Final Rule Date |
|---|---|---|---|
| Solvent Extraction for Vegetable Oil | 4/12/2001 | 2/19/2020 | 2/17/2021 |
| Boat Manufacturing | 8/22/2001 | 2/26/2020 | 5/19/2021 |
| Surface Coating of Metal Coil | 6/10/2002 | 12/5/2019 | 11/26/2020 |
| Cellulose Products Manufacturing | 6/11/2002 | 10/10/2018 | 12/18/2019 |
| Ethylene Production | 7/12/2002 | 1/17/2019 | 5/14/2020 |
| Paper and Other Web Coating | 12/4/2002 | 4/1/2020 | 7/28/2021 |
| Municipal Solid Waste Landfills | 1/16/2003 | 7/22/2020 | 11/17/2021 |
| Hydrochloric Acid Production | 4/17/2003 | 7/12/2018 | 7/11/2019 |
| Reinforced Plastic Composites Production | 4/21/2003 | 4/15/2020 | 7/7/2021 |
| Asphalt Processing & Roofing Manufacturing | 4/29/2003 | 9/26/2018 | 9/18/2019 |
| Integrated Iron & Steel Manufacturing | 5/20/2003 | 8/16/2017 | 11/6/2018 |
| Engine Test Cells/ Stands | 5/27/2003 | 8/29/2018 | 8/21/2019 |
| Site Remediation | 10/8/2003 | 11/7/2018 | 1/15/2020 |
| Miscellaneous Organic Chemical Manufacturing | 11/10/2003 | 6/17/2020 | 10/13/2021 |
| Surface Coating of Metal Cans | 11/13/2003 | 12/5/2019 | 11/26/2020 |
| Surface Coating of Miscellaneous Metal Parts  and Products | 1/2/2004 | 10/4/2017 | 12/10/2018 |
| Organic Liquids Distribution | 2/3/2004 | 6/17/2020 | 10/13/2021 |
| Stationary Combustion Turbines | 3/5/2004 | 5/20/2020 | 9/15/2021 |
| Surface Coating of Plastic Parts and Products | 4/19/2004 | 10/4/2017 | 12/10/2018 |
| Surface Coating of Automobiles & Light-Duty Trucks | 4/26/2004 | 8/30/2017 | 11/21/2018 |

The EPA has identified nine phases involved in the risk and technology review ("RTR") rulemaking.  Phase I (2 months) involves establishing a project team, determining whether to hire a contractor, identifying stakeholders interested in rule development, preparing written materials and conducting meetings with stakeholder groups, and—because the agency anticipates that it will have contractors perform work for all 20 categories—developing a work plan for the contractor and a back-and-forth between the agency and the contractor about the work plan.

(Tsirigotis Decl., ECF No. 31 Ex. A, ¶ 12).  The EPA notes that the Integrated Iron and Steel and Ethylene Processes source categories have completed Phase I.  (*Id.*).

Phase II (3 months) involves preliminary information collection from project files, the agency's library, major university libraries, public libraries, and the Internet, and gathering data on emissions from facilities in the source category.  (*Id.* ¶ 13).   The Integrated Iron and Steel and Ethylene Processes source categories have also completed Phase II.  (*Id.*).  Phase III (0 to 28 months) involves collecting supplemental information, which the agency believes will be necessary for "most" of the 20 categories.  (*Id.* ¶ 14).  At this stage, for each of the 20 categories, the agency will either find that additional information is not needed, collect information from 9 or fewer entities in a source category, or send information requests to 10 or more entities in a source category, the latter of which requires Office of Management and Budget (OMB) approval. (*Id.*).  The agency anticipates that it will not need to collect additional information for seven categories: Integrated Iron and Steel, Auto and Light Duty Truck, Miscellaneous Metal Parts, Plastic Parts, Metal Can, Metal Coil, and Solvent Extraction for Vegetable Oil.  (*Id.*).  It anticipates collection from fewer than 9 entities for six other categories, and anticipates requesting information from more than 10 entities for seven source categories.  (*Id.*).  The EPA estimates that the OMB process and information request to more than 10 entities adds 24 months to the total time for this phase, resulting in a 28-month timeframe for those seven categories. (*Id.*).

Phase IV (3 to 4 months) involves data analysis to determine inputs for risk models.  (*Id.* ¶ 15).  Two projects have already begun Phase IV: Integrated Iron and Steel and Auto and Light Duty Trucks.  (*Id.*).  Phase V (2 to 6 months) constitutes the risk analysis and technology review. (*Id.* ¶ 16).  Phase VI (12 to 15 months) involves development of the rule proposal package,

including drafting the proposed rules and briefing materials, drafting supporting documentation, and submitting those documents to the EPA workgroup for review.  (*Id.* ¶ 17).  Phase VII (3 months) is the public comment period, including one month for publication in the Federal Register and a planned 60-day comment period.  (*Id.* ¶ 18).  Phase VIII (3 to 5 months) involves the summarizing of comments and developing responses to comments.  (*Id.* ¶ 19).  Phase IX (6 to 8 months) is the development of the final rule package, involving drafting changes based on the comments, preparing recommendations based on comments and briefing for EPA management, and preparing the final rule and updating supporting documentation.  (*Id.* ¶ 20).

## II.    LEGAL STANDARD

### A.  Summary judgment

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).

### B.  Remedy

The Clean Air Act's citizen-suit provision provides that district courts can "order the Administrator to perform" an act or duty mandated by the statute, and can "compel . . .  agency action unreasonably delayed." 42 U.S.C. § 7604(a).  District courts are empowered to set deadlines which the agency must meet.  *See Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 704 (D.C. Cir. 1974) (upholding district court's use of a timetable for agency action as a reasonable means of compelling statutory duties unreasonably delayed).  An agency has a "heavy burden" to demonstrate that a remedial timeline is too strict: it must show that the timeline is "an impossibility." *Alabama Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979) (citing *Train*, 510 F.2d at 712).  Courts can take into consideration "constraints" such as "budgetary and manpower demands . . . [that are] beyond the agency's capacity or would unduly jeopardize the

implementation of other essential programs" and the limitations on the agency's ability to

evaluate available control technology.  *Id.* (quoting *Train*, 510 F.2d at 712).

## III.   ANALYSIS

As evidence of the feasibility of their proposed two-year timeline, Plaintiffs point to the

statutory framework and contend that any inability on the agency's part to complete the RTR

rulemakings would be inconsistent with what Congress envisioned.  (Pls. Mot. for Summ. J. at

20-21).  Because Congress ordered the EPA to promulgate emissions standards, from scratch, for

40 source categories in two years, Plaintiffs contend, the reviews they seek should be easily done

within the same amount of time.  Additionally, Plaintiffs claim, Congress clearly envisioned that

the EPA would be conducting multiple, parallel rulemakings for multiple source categories at

one time.  Plaintiffs also point to the EPA's extensive practice and familiarity with Clean Air Act

rulemakings, and suggest the use of templates.  (*Id*. at 22).

The EPA responds that its experience with rulemaking has led it to the conclusion that

the timetable it proposes is the "best estimate of the minimum reasonable time for completion of

the risk and technology reviews and promulgation of additional standards, if needed."  (Def.

Resp. at 2); (Tsirigotis Decl. ¶ 8).  Since 2012, the EPA notes, it has not completed an RTR in

less than 2.5 years from the start of the project.  (Tsirigotis Decl. ¶ 21, Attachment 1).

Additionally, the EPA suggests that it is currently engaged in seven other rulemakings, several of

which are court-ordered, and therefore it has fewer resources available for the 20 RTRs at issue.

(*Id.* ¶ 7).  It explains that the rulemakings at issue are "relative[ly] complex[]" and Plaintiffs'

timeline could "possibly . . . eliminat[e] [its] ability to consider any new information received

during the comment period."  (Def. Opp. at 3).  It points to the importance of Congress's

directive that the public be able to participate in rulemaking, and suggests that Plaintiffs'

timeline would inhibit that important mission.  (*Id.* at 11).  It notes that the original two-year timeline for standards promulgation cannot be compared to RTR rulemakings, which Congress gave the EPA eight-year periods to do, and which "entail[] issues that are outside the scope of the original NESHAP rulemaking and may be complex and time-consuming to resolve."  (*Id*. at 22).

Plaintiffs reply that while reviewing an existing standard may require some different analysis than developing the standard in the first place, if anything, the former should take *less* time.  (Pls. Reply at 7).  Plaintiffs also point out that Congress did not contemplate the RTRs taking eight full years, but rather, *occurring* at least every eight years.  (*Id*.)  The court agrees: if the RTRs were begun immediately after the completion of the most recent set of RTRs, they would be futile, as there would not yet be developments in technology.  A standard of *how often* something should take place does not describe how long the thing should take.  Plaintiffs doubt the validity or relevance of the EPA's citation to previous RTRs that have taken at least 2.5 years, pointing out that those timelines resulted from settlements, and in some instances constituted "renegotiated" timelines, rather than court orders.  (Reply at 12).  The court finds the 2.5-year timeframe to be a useful benchmark, regardless of its provenance.  If the agency negotiated a settlement for a particular timeline, that number represents a shorter timeline than the agency asked for, and if it needed to renegotiate, then the agreed-upon timeline was in fact impossible.  The court sees little pragmatic value in ordering the agency to meet deadlines that proved impossible in the settlement context.

Plaintiffs point to inaccuracies in the specific amounts of time Defendants identified as necessary for each phase of the rulemaking.  First, Plaintiffs argue, the timing throughout is overestimated, because it takes other obligations into account.  (Pls. Reply at 18).  Second,

Plaintiffs argue, Phases I and II are nearly complete already.  (*Id.*).  Third, Phases III and V are speculative and refer to actions the EPA may not need to take.  (*Id.* at 19, 23).  Fourth, Plaintiffs note that the EPA requested two months for Phase IV in a comparable district court case in Northern California involving the yeast manufacturing source category, but now states that Phase IV takes three to four months.  (*Id.* at 22-23); see *Club v. McCarthy*, 2016 WL 1055120 at *5 (N.D. Cal. March 15, 2016).   Fifth, Plaintiffs contend that the OMB review described by Defendants in Phase VI is discretionary and therefore should not interfere with the EPA's fulfillment of Clean Air Act responsibilities.  (*Id.* at 23) (citing *In re United Mine Workers of America Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (finding 90-day OMB review required by Executive Order No. 12,866 does not set aside statutory timetables created by Congress)). Last, Plaintiffs argue that Phases VII-IX are routinely conducted in approximately half of the 12 to 16 months the Tsirigotis Declaration states the EPA requires.  (*Id*. at 24).

The EPA responds that the speculative time included in their Phase III and VI estimates is necessary, because the agency cannot know in advance whether additional information will be needed to complete the RTRs, and it would be "impracticable" for the agency to have to request an extension upon determining that more time is needed.  (Def. Reply at 11).  The agency states that Phases I and II are not complete.  (*Id.* at 17).  It differentiates the two-month estimate for Phase IV identified in the California case on the basis that the nutritional yeast manufacturing source category was less complex than the source categories at issue in this case.  (*Id.* at 18). The agency argues that whether or not OMB review is "discretionary," nothing in the language of Congress prohibits the agency from determining how to employ its staff and implement coordination between staff and management.  (*Id.* at 19).  And the agency explains that in other contexts where Phases VII through IX were completed in under seven months, the rulemakings

were either simpler, or there had already been a long stretch of time in Phase VI, or there were fewer rules being made.  (*Id*. at 21).

The EPA also states that the quality of the rules would suffer if it had to meet Plaintiffs' timeline.  (Def. Opp. at 23).  Plaintiffs respond that the EPA's mandate is to produce adequate rules, and a conclusory claim that more time would result in a better rule is not enough.  (Reply at 15).  The court agrees that more time could always result in a better product, but the relevant legal standard in this circumstance is "impossibility."  The EPA has nowhere stated that Plaintiffs' timeline is "impossible," nor that producing an adequate rule under that time frame is "impossible," nor that public participation within that timeframe would be "impossible."  The court agrees with Plaintiffs' contention that the agency's justifications for its inability to meet their timeline are too vague; citing other obligations but failing to describe what they are, what type of resources they consume, and whether they could be delayed to prioritize the RTR rulemakings at issue.   (Pls. Reply at 5, 10).

Absent an actual contention, backed by evidence, of "impossibility," the court will not accede to the agency's suggested timeline.  But, while the court does not doubt the urgency of revising and promulgating standards to regulate emissions, addressing the ongoing health and environmental threats they pose, the court finds, like another court in this district did in *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 58 (D.D.C. 2006), that Plaintiffs' timeline may be "simply too compressed at this stage to afford any reasonable possibility of compliance."  Accordingly, the court will impose a schedule in between that requested by Plaintiffs and that proposed by the agency.

**IV.      CONCLUSION**

For the reasons set forth above, the court will GRANT IN PART and DENY IN PART

Plaintiffs' motion for summary judgment; DENY Defendant's motion for summary judgment,

and enter judgment in favor of Plaintiffs.  The court will order completion of all 20 source

category RTRs within three years.

A corresponding order will issue separately.

Date:  March 13, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge